IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 25, 2020

**DAVID JENKINS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Franklin County**
**No. 2013-CR-93     Thomas W. Graham, Judge**

_____

**No. M2019-01238-CCA-R3-PC**

_____

Pro se Petitioner David Jenkins was originally charged with first degree premeditated murder and felony murder in the perpetration of especially aggravated kidnapping. The trial court granted a directed verdict on the felony murder charge, and the jury convicted the Petitioner of first-degree premeditated murder. State v. David G. Jenkins, No. M2016-00270-CCA-R3-CD, 2017 WL 1425610, at *1 (Tenn. Crim. App. Apr. 21, 2017). The trial court sentenced the Petitioner to life imprisonment to be served consecutively to his sentence for a prior offense. The Petitioner later filed a petition for post-conviction relief, alleging numerous grounds of ineffective assistance of counsel, which was denied by the post-conviction court. In this appeal, the Petitioner claims the post-conviction court erred in denying relief. Upon our review, we affirm.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN G. GLENN, J., joined.

David Jenkins, Pro Se, for the Petitioner.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; and Steve Blount, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

As relevant to the issues raised in this post-conviction matter, the evidence presented at trial established that the victim, Corey Matthews, was a member of the Aryan Nation

and was serving as a confidential informant for law enforcement. After other members of the Aryan Nation learned of the victim's actions, the Petitioner and his co-defendants, Todd Dalton, John Corey Lanier, and Coty Holmes, drove the victim to a remote location where they beat the victim. David G. Jenkins, 2017 WL 1425610, at *1. Co-defendant Lanier used a knife to cut an "X" over the victim's Aryan Nation tattoo on his abdomen. The Petitioner then struck the victim on the head and face multiple times with a ball-pein hammer, resulting in the victim's death.

Co-defendants Holmes and Lanier testified at trial concerning the events leading up to the victim's death. On the day of the offense, at approximately 10:00 a.m., co-defendant Dalton called and asked co-defendant Holmes to come to his shop. Co-defendant Holmes then learned that the victim was to be kicked out of the Aryan Nation because the victim had been serving as an informant for law enforcement. Co-defendant Holmes understood that the victim would receive a "beat-out" and that the victim's "patch" or tattoo would be "covered." Co-defendant Holmes explained that the victim's tattoo would either be cut or covered with another tattoo. Co-defendant Holmes said the Petitioner was present during the conversation about what was to happen to the victim.

Before they left co-defendant Dalton's shop, co-defendant Holmes observed the Petitioner retrieve a ball-pein hammer from the back of his truck. The men then went to pick up co-defendant Lanier and eventually went to Tractor Supply in Winchester, Tennessee, to meet the victim. The victim got into the backseat of co-defendant Dalton's truck with codefendants Lanier and Holmes. After driving to another friend's home, the men returned to the Tractor Supply store where the victim's car was parked. The men eventually drove to the victim's home, where all five of the men got into co-defendant Dalton's truck. Co-defendant Holmes turned off his cellular phone, and co-defendant Dalton placed it in the glove compartment of his truck. Co-defendant Holmes believed everyone turned off their cellular phones and put them away.

Co-defendant Dalton drove to a cemetery located approximately ten to fifteen minutes from the victim's home. Upon arriving, the victim was eventually pushed into co-defendant Holmes and they "tangled up, threw a couple of punches, [and] went to the ground." Co-defendant Holmes punched the victim "a couple of times" and while the victim was lying on the ground, the other four men hit and kicked the victim "a couple of times." The Petitioner then retrieved a ball-pein hammer and began hitting the victim in the head with it. The co-defendants yelled at the Petitioner to stop; however, the Petitioner hit the victim five or six times, stopped, and then resumed hitting the victim five or six more times. Once the Petitioner and the other co-defendants got back into the truck, the Petitioner acted excited and told co-defendant Holmes and Lanier that they "had earned [their] bones."

Co-defendant Lanier confirmed that the victim was a member of the Aryan Nation and that the Petitioner had told him that the Petitioner was associated with the Aryan Brotherhood. Co-defendant Lanier said that upon arriving at the cemetery co-defendant Dalton told the victim, "You [have] been talking to the police. You know what that means." The Petitioner and co-defendant Holmes then went after the victim. Co-defendant Lanier confessed to tackling and hitting the victim twice. After the men cut an "X" over the victim's tattoo, they kicked the victim in the head and stomped him. Co-defendant Lanier testified that the men were about to leave the victim; however, the Petitioner hit the victim in the head with a ball-pein hammer three to four times. Co-defendant Lanier yelled at the Petitioner to stop, and the men got in the truck and left. Co-defendant Lanier said that the victim was conscious when he was cut and semi-conscious and making sounds before the Petitioner hit him with the hammer. David G. Jenkins, 2017 WL 1425610, at *5-6.

The men returned to Manchester, Tennessee, where the Petitioner purchased beer at Tops, a convenience store. The Petitioner had blood on his arms and stated that "the lady in the store looked at him like he was crazy because he had blood on his arms." Co-defendant Holmes stated that co-defendant Dalton owned a trailer on co-defendant Dalton's property where a man named "Shorty" lived. Co-defendants Holmes and Dalton went to the trailer, and co-defendant Dalton told "Shorty" what had occurred. David G. Jenkins, 2017 WL 1425610, at *2-4.

Co-defendant Lanier confirmed he was a "regular member" of the Aryan Nation and was not an "enforcer." He said the Petitioner was a member of the Aryan Brotherhood and not the Aryan Nation. A few days prior to the victim's death, co-defendant Lanier attended a meeting at the home of "Shorty" and Tabatha Roulette Jones. Co-defendant Lanier attended one formal meeting of the Aryan Nation during which rankings were discussed. The victim said he was an "enforcer" with the gang, which co-defendant Lanier believed meant that the victim ensured that people followed the rules. Co-defendant Lanier said a member who violated the rules of the Aryan Nation could have his tattoo removed. David G. Jenkins, 2017 WL 1425610, at *6. Co-defendant Lanier stated that the Petitioner had blood and brain matter on him when he purchased beer at the convenience store following the victim's death. Co-defendant Lanier testified that when he was a member of the Aryan Nation, he believed that "blood out," during which a member was removed from the gang, meant that the member was beaten and not that the member was killed. Co-defendant Lanier did not recall the Petitioner saying anything about the blood and brain matter on him upon returning from purchasing beer following the victim's death. State v. David G. Jenkins, 2017 WL 1425610, at *6.

On March 24, 2013, in response to a missing person report filed by the victim's wife, Officer Mike Holmes of the Cowan Police Department began driving around Jackson

Cemetery, a secluded area near the victim's home where people would go to think or fight. Officer Holmes found the victim's body in a cut cornfield approximately thirty yards from the gravel road that separated the cemetery and the cornfield. David G. Jenkins, 2017 WL 1425610, at *8. Investigator Brian Brewer with the Franklin County Sherriff's Office eventually developed the Petitioner, and co-defendants Dalton, Lanier, and Holmes as those who were with the victim on Saturday, March 23, 2013, prior to his death. Id. Officers also obtained videotapes of the Petitioner along with the victim and the co-defendants recorded by several convenience stores on March 23, prior to the victim's death. Investigator Brewer said that while he received information that the Defendant and the co-defendants stopped at another convenience store to purchase beer after killing the victim, he was unable to place any of the men at a particular convenience store during that time period. Id. at 8. The Petitioner was eventually apprehended in September 2013, in Hobbs, New Mexico. David G. Jenkins, 2017 WL 1425610, at *11.

The Petitioner appealed his conviction and sentence, which were affirmed by this court, and permission to appeal to the Tennessee Supreme Court was denied on September 20, 2017. On October 30, 2017, the Petitioner filed a seventeen-page, pro se petition for post-conviction relief, raising numerous grounds of ineffective assistance of trial counsel. Although the Petitioner was represented at trial by two trial counsel, lead counsel and co-counsel, he challenged the conduct of only co-counsel. On December 12, 2017, the Petitioner was appointed post-conviction counsel. First post-conviction counsel filed a motion to withdraw, noting that upon review of the allegations in the Petitioner's petition they appeared to be "personal . . . questioning [co-counsel's] mental competency." Because first post-conviction counsel knew co-counsel, first post-conviction believed he had a conflict in representation. The trial court granted the motion to withdraw, and on February 6, 2018, the court appointed second post-conviction counsel to represent the Petitioner. On August 17, 2018, second post-conviction counsel filed a motion to withdraw, which was also granted by the court. The next day, the post-conviction court entered an order appointing third post-conviction counsel and setting the matter for a hearing on December 11, 2018. On October 29, 2018, third post-conviction counsel filed a motion to withdraw, and on December 3, 2018, the Petitioner filed a motion to proceed pro se to represent himself at the post-conviction hearing. An amended petition for post-conviction relief, which mirrored the original petition in substance, was filed by third post-conviction counsel on February 11, 2019.

On February 28, 2019, the State filed a detailed response, denying the allegations in the petition. The State's response noted that the post-conviction court declined to remove third post-conviction counsel on December 11, 2018. On February 28, 2019, the post-conviction court entered an order granting the Petitioner's motion to represent himself at the post-conviction hearing, and upon the Petitioner's request, the post-conviction court directed third post-conviction counsel to remain involved in the case as "elbow counsel."

- 4 -

On May 23, 2019, the post-conviction court conducted an evidentiary hearing on the petition. The Petitioner called several witnesses who previously testified at trial including Dr. David Zimmerman, Special Agent Maureen Bottrell, Special Agent Charly Castelbuono, Special Agent Michael Frizzell, Special Agent Nicholas Christian, and Investigator Bradley Weaver. He also called the first attorney appointed to represent him, both assistant district attorneys who prosecuted his case, and lead counsel. He did not call co-counsel to testify. Additionally, the guilty plea transcripts of co-defendants Holmes and Lanier were entered into evidence as exhibits to the hearing.

As relevant here, Dr. Zimmerman conducted the autopsy of the victim and previously testified at trial that the victim died on either Saturday, March 23 or Sunday, March 24, based upon his examination. David G. Jenkins, 2017 WL 1425610, at *10. Dr. Zimmerman noted fourteen separate lacerations to the victim's head and face as a result of blunt force trauma. The lacerations included an "L" shaped laceration on the right side of the victim's scalp. Dr. Zimmerman said ten of the blows were likely significant enough to have caused the victim's death. He said a hammer could have caused the fourteen blows to the victim's head and face. Dr. Zimmerman agreed that two lacerations were "L" shaped and were not consistent with the "round part" of a hammer. He stated that if an "L" shaped piece of metal were used, he would expect abrasions on both sides of the laceration. Id. Dr. Zimmerman also testified that a hammer with a flat face usually would not have caused the "L" shaped injuries. He stated that the edge of a flat object could have caused the "L" shaped lacerations. He also stated that had the victim been hit with any straight portion of a ball-pein hammer, it could have caused the "L" shaped lacerations. Id. at *11.

At the post-conviction hearing, the Petitioner showed Dr. Zimmerman two unidentified photographs that were presumably presented as exhibits at trial. Dr. Zimmerman said there were "no distinguishing marks about the wounds in these pictures." He reiterated his trial testimony that the wounds "could have been from a glancing blow from that hammer, but it could also have been from something totally different." Asked if he could say "with full confidence, a ball-pein hammer inflicted that wound," Dr. Zimmerman replied, "No. I can say that some hard object inflicted that wound." He agreed that it was possible that more than one weapon was used in the commission of the victim's death. Dr. Zimmerman also agreed that he was unable to determine the exact time of the victim's death. Dr. Zimmerman was questioned about the medical history leading up to the death of Christopher "Shorty" Bryant, the evaluation of which was conducted by an associate. The medical report, admitted into evidence without objection, showed that Christopher "Shorty" Bryant died of a "suspected overdose." Dr. Zimmerman testified that an autopsy is not conducted on an individual "if there is a significant potential natural cause of death" or an "extended period of time since injury" and the persons death.

Agent Maureen Bottrell previously testified at trial as a geologist forensic examiner with the Federal Bureau of Investigation (FBI). Her report, admitted as an exhibit at trial, compared soil samples from the field where the victim's body was found to the debris taken from the victim's shoes, debris from co-defendant Dalton's truck, and debris taken from the Petitioner's boots, none of which were determined to match. She explained that the difference between the known soil sample and other items may have been impacted by the depth of the soil or changes within the soil location that can occur "very abruptly." She said these changes may be affected by distance, weather, and time frame. Defense counsel did not cross-examine Bottrell at trial. At the post-conviction hearing, Agent Bottrell reiterated her conclusions that the soil did not match. With respect to the Petitioner's boots, she said the soil was a different color, which concluded her analysis. She also compared the soil from the victim's shoes to the soil from the Petitioner's boots and determined it did not match.

The first attorney appointed to represent the Petitioner in this case, who did not represent the Petitioner at trial, testified that at the time of his representation he did not recall whether a second statement by co-defendant Cory Lanier existed. He also testified that the cell phone records provided to him by the State were difficult to explain to the Petitioner, and they did not provide an exact address for the location of the cell phone. He stated that he provided the Petitioner with every statement that was provided to him by the District Attorney's office.

Special Agent Charly Castelbuono, a forensic biologist with the Tennessee Bureau of Investigation (TBI), previously testified at trial that the victim's blood was on the front passenger's side door around the area of the speaker of co-defendant Dalton's truck, that the truck smelled of bleach or some kind of cleaning agent, and that there was discoloration on the floorboard. David G. Jenkins, 2017 WL 1425610, at *9. A beer can found near the victim's body had a saliva mixture of two DNA profiles around the mouth area with the victim as the major contributor. Her testimony at the post-conviction hearing was consistent with her trial testimony. Agent Castelbuono also testified that she did not receive any other known DNA standards except those belonging to the Petitioner and the victim. She also confirmed that she previously tested various items from the Petitioner's home, none of which contained DNA other than his own.

Assistant District Attorney (ADA) Steve Blount, a veteran prosecutor with nearly thirty-five years of experience, was the lead prosecutor assigned to try the Petitioner's case. ADA Blount testified that he had "butted heads" with both lead counsel and co-counsel during trial. He agreed that co-counsel had used both podiums and that co-counsel may have left his notes on the State's podium. ADA Blount said that co-counsel also moved his chair closer to the State's table to better hear witnesses. ADA Blount further explained that co-counsel had revealed where Tabitha Roulette Jones, a trial witness for the State,

lived during questioning, upon which ADA Blount asked to approach the bench. During the bench conference, ADA Blount said the comment by co-counsel was inappropriate and unethical. ADA Blount said co-counsel then became upset with him because he had questioned co-counsel's ethics, and the court told both parties to "calm down." Asked if comments such as "taking [an attorney] outside" or "I don't care if you disbar me and put me in jail" were improper, ADA Blount explained:

> That is not unusual behavior in litigation, especially when one attorney accuses the other attorney of being or saying something that is interpreted as being unethical. I've done this almost 35 years, and that is not the first time that I've experienced two lawyers in the heat of a battle . . . . of a multiple day trial, get upset with each other, say things about each other, so, no, that's not unprofessional conduct.

ADA Blount was asked additional questions concerning witness Tabitha Roulette Jones. He stated that prior to trial, the State took the deposition of Jones and intended for her to testify at trial. When Jones testified, ADA Courtney Lynch asked her to explain why her boyfriend Christopher "Shorty" Bryant, another intended witness, was not there, expecting Jones to say Bryant was deceased.[1] However, Jones said Bryant had been killed because of his cooperation with authorities, which ADA Blount characterized as non-responsive. ADA Blount said that Jones's testimony did not implicate the Petitioner in the death of Bryant. ADA Blount denied any knowledge of the circumstances of his death and noted that ADA Lynch did not pursue that line of questioning upon receiving Jones's unexpected response. He was unaware that Jones received a disability check from the State, and he stated that there was nothing in his interaction with Jones that demonstrated she may have been incompetent or not qualified to testify as a witness at trial.

ADA Blount also stated that while he had no independent recollection of the exact name of the store, information in their investigation led him to believe that the Petitioner and his co-defendants went to a store after the homicide. ADA Blount hoped investigators could find videos to substantiate the statements; however, the investigators were unable to do so. There was a lengthy discussion concerning the testimony of Lisa Lotz, a witness at trial who described the Petitioner's tattoos. ADA Blount explained there was no photograph of the Petitioner's tattoos admitted into evidence until after her testimony. Apparently, at the insistence of the Petitioner, photographs of his tattoos were later taken

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

and used by both parties in closing argument. The State argued in closing that the photo matched Lotz's description, but the defense argued it did not.

Lead counsel, a veteran defense attorney with over 32 years of experience, testified regarding his involvement in this case. Lead counsel confirmed that he had received the first statement of co-defendant Cory Lanier "early on" and received a second statement "late in the game" or "two or three days" prior to trial. Lead counsel said they suspected the second statement existed. Lead counsel said he listened to the second statement prior to trial, took notes, and brought his notes with him to trial. He said he could impeach the witness with his notes or the transcript of the statement. He said the court was also equipped with the ability to pull up the recording for impeachment purposes had that been necessary. Lead counsel confirmed that there was information that the Petitioner and the co-defendants had gone to a store following the murder; however, lead counsel said the investigators were unable to find the store. Lead counsel agreed that he interviewed the Petitioner's girlfriend, Heather Albright, prior to trial. His notes about the interview were admitted as an exhibit to the hearing. Lead counsel further agreed that he did not re-interview Albright after interviewing Josh Russell. Russell, an inmate at the Bedford County Jail, testified at trial that the Petitioner told him about the murder and that the police did not find any evidence at his home because he went to his girlfriend's home after the homicide. He said that Russell "sort got thrown on us at the eleventh hour." Lead counsel said he did not call Albright to testify at trial because she was not to be found. He investigated the theory that the victim was killed somewhere other than the offense location; however, they were unable to substantiate that theory.

The Petitioner's W-2's from his employment in New Mexico were admitted into evidence, and the Petitioner suggested the records disputed the jury instruction on flight. Lead counsel admitted the Petitioner's employer was cooperative. Lead counsel said that he remembered investigating the Petitioner's cell phone records of communications between the Petitioner and Albright; however, he did not find any for the relevant time-period, and Albright could not remember any communications. Lead counsel confirmed that they obtained the Petitioner's cell phone records and that there was a difference between the cell phone records received from the first attorney and lead counsel. However, lead counsel noted upon prompting by the court that neither record showed any cell activity during the "12, 15-hour period, that [the Petitioner was] looking at." Lead counsel also said that he had a cell phone expert examine the Petitioner's cell phone records and had "laboriously" gone through the text messages, but he could not find anything that was inconsistent with the testimony at trial. As for the testimony of Tabitha Roulette, lead counsel said that they investigated whether it was possible for her to have overheard the discussion outside her trailer between the co-defendant's and her late boyfriend. Lead counsel recalled it was possible or that there was not enough evidence to the contrary. Lead counsel said it was more important to elicit the testimony that Roulette saw blood on co-

defendant Holmes, not the Petitioner, that night. Lead counsel said the issue "passed Crawford;" but he did not "catch" any Bruton issue. Asked whether lead counsel could have forced co-defendant Dalton to testify about his policy of leaving someone in his house with his wife while co-defendant Dalton was not there, trial counsel disagreed that that would have been admissible. The Petitioner argued with lead counsel that although he moved for the admission of co-defendant Dalton's testimony and was denied by the trial court, lead counsel never argued that the testimony was admissible as "res gestae."

Lead counsel recalled that co-counsel may have forgotten things during voir dire and may have misstated witness names during trial. Lead counsel explained however as follows:

> Oh, I disagree with that. [Co-counsel] is a very, very smart man. He does not – detail has never been his strong point. Thinking things through and strategizing is, and he's the best I've ever seen at it to this day.

He continued to explain that "jurors love [co-counsel]." He acknowledged that co-counsel told the jury that he had had brain surgery and a stent put in, which had been within the past year. Lead counsel denied co-counsel was "confused" so much so that witness testimony was not admitted during trial. Lead counsel said that he had co-defendant Cory Lanier's second statement and was prepared to use it at trial. Lead counsel also hired a private investigator with his personal funds to facilitate the interview of Lisa Lotz in New Mexico. Lead counsel confirmed that photographs of the Petitioner's tattoos were taken at trial. However, he said that he would not have shown the photographs to Lotz, even if given the opportunity. He said there was "[t]oo much risk she would have pointed directly to it and it would have backfired." The Petitioner did not call co-counsel to testify although he was present at the hearing.

The Petitioner called TBI Special Agent Michael Frizzell, who previously testified at trial, in relevant part, that he was employed with the TBI's technical services unit and analyzed the cellular phone records of the Petitioner, his co-defendants, and the victim for March 23, 2013. Special Agent Frizzell testified that according to the Petitioner's cellular phone records, the network did not register after 10:10 a.m. The agent said the Petitioner's cellular phone was either turned off or in a "dead spot." David G. Jenkins, 2017 WL 1425610, at *9-10. Special Agent Frizzell agreed that someone attempted to contact the Petitioner, but his cell phone did not register. Special Agent Frizzell said that he could not determine based on the records he was provided whether this attempt was voice or text communication. Special Agent Frizzell clarified at trial that the cell phone records he was requested to analyze were for voice communication only. Special Agent Frizzell did not have real time data (RTD) or range to tower (RTT) data, which provides text information, for the Petitioner's cell phone records. Accordingly, Special Agent Frizzell testified that

the Petitioner's cellular phone could have been used for texting on the day of the offense at trial.

At the post-conviction hearing, Special Agent Frizzell testified consistently with his trial testimony. He also reviewed the cell phone records the Petitioner obtained from his first attorney and determined that it was a Cellebrite cellular phone extraction report. Upon review of these records, Special Agent Frizzell confirmed there were two text messages, at 4:00 p.m. and 5:46 p.m. (central standard time), on the Petitioner's cellular phone on the day of the offense. He did not find any text message activity between 5:46 p.m. and 11:00 p.m. (central standard time). Special Agent Frizzell said that at the time of the offense, Verizon did not include tower usage for texting in their data so it would have been impossible to track the geographical location of a phone based on text communication.

The Petitioner called TBI Special Agent Nicholas Christian, who explained that he conducted the extraction on the cellular phones involved in the instant case. He provided his extraction report to TBI Special Agent Chip Andy. He further testified that the data on his extraction report is not the same as the information collected by the cell phone provider. TBI Special Agent Leo "Chip" Andy, III, testified that he responded to the crime scene, photographed the Petitioner's tattoos, and participated in obtaining the warrants to retrieve the cell phone records in this case. Special Agent Andy also testified generally regarding polygraph examinations and, over the prosecutor's objection, was permitted to testify that co-defendant Lanier had engaged in "deceptive" behavior during his polygraph examination. On cross-examination, Special Agent Andy said he collected the soil samples from the crime scene three months after the offense.

Investigator Bradley Weaver testified that he was familiar with the victim, had received information from the victim, and that none of the cases the victim had provided information on involved the Petitioner. Investigator Weaver had no information on the Petitioner prior to the instant offense. He said the victim provided information on drug cases but died before they were adjudicated.

Courtney Lynch, the assistant district attorney who served as co-counsel to ADA Blount, was also called to testify. ADA Blount was unaware that co-defendant Lanier had failed a polygraph examination and, when asked about her comment in opening statement of trial that the co-defendants were given "a deal" in exchange for their "truthful" testimony, she explained:

> If I had it to do over again[,] I may not use that word, but I was trying to call attention to the fact that we weren't hiding. We had agreed – made agreement with them, we had disclosed that to the defense, just get that out

there in the open in the beginning, that we did talk to them, they are going to testify for the State against the [Petitioner] was just kind of off the cuff . . .

She continued to state that she would never "put a witness on that we didn't want to be truthful." She said Tabitha Roulette Jones's testimony concerning the circumstances of Christopher "Shorty" Bryant's death was truthful to ADA Lynch's knowledge.

On June 17, 2019, by written order, the post-conviction court denied relief based on the Petitioner's failure to demonstrate by clear and convincing evidence deficient performance or prejudice as alleged at the hearing. On July 11, 2019, the Petitioner, acting pro se, filed his notice of appeal of the order of the post-conviction court. The Petitioner has since filed a thirty-two-page opening brief and a forty-nine-page reply brief, essentially mirroring the numerous grounds of ineffective assistance of counsel raised in his original and amended petition for post-conviction relief. The Petitioner additionally contends (1) that trial counsel were ineffective in failing to "see by clear and convincing evidence that Tenn. R. Evid. 404(b) was properly enforced;" (2) the post-conviction court erred "in finding that the Petitioner has failed to prove . . . a Massiah or a Giglio violation;" and (3) prosecutorial misconduct. The Petitioner also argues generally that "this case satisfies all three prongs of Cronic[,]" because trial counsel were deficient through the entirety of the trial. We will address each of these issues in turn.

## ANALYSIS

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases. Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010).

In order to prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

- 11 -

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Under United States v. Cronic, 466 U.S. 648 (1984), a different post-conviction standard of review is employed. Howard v. State, 604 S.W.3d 53, 58 (Tenn. 2020). In Cronic, the Supreme Court described three situations in which prejudice should be presumed because these circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. (quoting Cronic, 466 U.S. at 658). Those circumstances include: (1) "the complete denial of counsel"; (2) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. (quoting Cronic at 659-60). Upon our review, we conclude that the limited exception under Cronic is not applicable to this case. Accordingly, we will apply the general test set forth in Strickland to resolve the claims in this case.

A. The Petitioner first argues that "[co-counsel] was so unprofessional that he hampered [the Petitioner's] defense." In support, the Petitioner cites the following statements of co-counsel from the trial transcript (1) asking the prosecutor to "meet him in the parking lot;" (2) stating "I don't care if you disbar me and put me in jail;" (3) "what [the State] like[s] is not necessarily important;" (4) an alleged "sexist" comment to the jury "Does any men ever sit on the grand jury or all just women;" and (5) "tasteless jokes about the [district attorney] representing the State's witness Corey Lanier." The Petitioner also claims that co-counsel was unprofessional during the cross examination of Investigator Brewer because he stood at the podium designated for the State. The Petitioner claims that

- 12 -

"but for the unprofessional conduct of [co-counsel]," the Petitioner would have received "a more favorable outcome."

In response, the State contends that co-counsel was not so unprofessional that he hampered the Petitioner's defense. The State insists the Petitioner has either misread the record or has taken co-counsel's comments out of context. As further support, the State points to the testimony of co-counsel and the assistant district attorney, both of whom denied that trial counsel's conduct was unprofessional or unusual under the circumstances. Upon our review, we agree with the State.

We have engaged in an extensive review of the trial transcript and the citations of alleged misconduct of co-counsel by the Petitioner. The gravamen of the Petitioner's complaint here is the alleged unprofessional misconduct of co-counsel, which is more akin to an ethical complaint rather than an abridgement of a constitutional right. The pertinent provision of the Post-Conviction Procedure Act provides that relief under the Act "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." State v. McKnight, 51 S.W.3d 559, 564 (Tenn. 2001) (internal citations omitted). Questions which are independent of the validity of trial and sentencing, [are] not within the contemplation of the Act. Id. (internal citation and quotation omitted). Here, co-counsel's alleged "crude" or "unprofessional" behavior is a question independent of the validity of the Petitioner's trial and sentence and not contemplated by the Act. To the extent the Petitioner claims co-counsel's comments collectively amount to deprivation of the Sixth Amendment right to counsel, we disagree. While co-counsel's style may have been less than tactful, none of these comments amount to deficient performance. The Petitioner is not entitled to relief on this issue.

B. In a related claim, the Petitioner contends that co-counsel was mentally impaired based on co-counsel's statement to the jury that co-counsel had recently undergone brain surgery and was "not at his best." The Petitioner also claims that co-counsel frequently "wandered off," "found himself at the State's podium," and sat his chair closer to the State than the defense table. As further evidence of co-counsel's impairment, the Petitioner points to portions of trial during which the Petitioner claims co-counsel was unable to remember what was to be elicited from the statement of Mark Luttrell, a witness deemed unavailable to testify by the trial court and who gave the order to co-defendant Dalton to kill the victim. The Petitioner also argues co-counsel was "mixed up" during voir dire and confused witnesses names resulting in mistakenly excusing one witness without cross-examination. Specifically, the Petitioner claims that co-counsel intended to ask Investigator Brewer about an interview with the Petitioner during which Investigator Brewer told the Petitioner that "I don't believe you did it." However, according to the Petitioner, co-counsel did not question Investigator Brewer about the statement because he

confused Investigator Brewer with another officer, Chad Partin. When co-counsel attempted to ask Officer Partin about the statement, the State objected. The Petitioner claims this statement was "very relevant as to flight" because had it been entered it would have shown that the Petitioner "left Tennessee without fear of prosecution." He further argues that co-counsel's confusion resulted in the failure to obtain unidentified Jencks material.

In response, the State contends that co-counsel was not mentally impaired during trial. Once again, the State maintains that the Petitioner has misread the record or has taken co-counsel's comments out of context. The State additionally relies upon the testimony of lead counsel, who denied that co-counsel was in any way impaired. The State further argues that the Petitioner did not include the claim that co-counsel failed to ask Investigator Brewer about the statement that he did not believe the Petitioner committed the murder in his amended petition; accordingly, this issue is waived. Waiver notwithstanding, the State argues co-counsel later presented the statement to the jury through Detective Partin, who testified, in fact, that he told the Petitioner, "Dave, you're not a killer, I believe you're not the killer."

We have reviewed the record and conclude that the Petitioner has failed to demonstrate deficient performance or prejudice based on co-counsel's alleged mental impairment. To the contrary, the record shows that co-counsel was keenly aware of the issues and zealously advocated on behalf of the Petitioner. As relevant here, the record shows that the admissibility of multiple statements by Mark Luttrell, an unavailable witness, was a hotly contested and legally complex issue. Lead counsel had filed pre-trial motions seeking the admissibility of the Luttrell statements, and the trial court reserved ruling on the matter upon hearing further proof at trial. During Investigator Brewer's cross-examination, co-counsel attempted to elicit testimony about the Mark Luttrell statements, and the State objected because co-counsel had not provided an exception for the admissibility of the statement, not because Investigator Brewer was the wrong witness. Moreover, during an out of jury hearing, the record shows that co-counsel sought to admit Luttrell statements during the State's case in chief because the trial court had not yet ruled on the issue. However, the trial court instructed co-counsel that it would be more appropriate to seek admission of the statement during the defense proof and with the proper exceptions. Contrary to the Petitioner's claim, co-counsel argued that the Luttrell statement was indeed admissible to counter the State's allegation that the Petitioner fled the country following the murder. Additionally, later in the defense proof, co-counsel called two investigators, Detective Chad Partin and Investigator George Dyer, to testify on behalf of the Petitioner. Each investigator testified to telling the Petitioner that they did not believe the Petitioner was the killer. While each investigator made the statement to get the Petitioner to discuss the case, it was clear that co-counsel elicited the testimony to rebut the State's flight theory. In other words, co-counsel sought admission of the statement to

show that the Petitioner left the State without fear of prosecution because authorities did not believe the Petitioner was the killer.

Moreover, ADA Blount and lead counsel each testified at the post-conviction hearing that there was nothing unusual about co-counsel's conduct during trial. Accordingly, the Petitioner has failed to demonstrate deficient performance, and he is not entitled to relief.

C.  The Petitioner next argues that co-counsel was ineffective in failing to adequately cross-examine various witnesses or subject the State's case to "any reasonable scrutiny."  He specifically argues that co-counsel failed to effectively cross examine Brad Weaver, co-defendant Cory Lanier, Lisa Lotz, Tabitha Roulette Jones, Tina Stephens, George Dyer, and Maureen Bottrell.

In response, the State contends that trial counsel adequately cross-examined the witnesses in this case.  The State points out that the Petitioner fails to explain how trial counsel failed to effectively cross examine co-defendant Lanier "other than to say [trial counsel] did not have some unidentified Jencks material and did not ask certain unidentified questions on cross-examination."  The State further relies on lead counsel's testimony at the post-conviction hearing, maintaining that they received co-defendant Lanier's statements, that they were prepared to use the statements to impeach co-defendant Lanier if necessary, and that co-counsel adequately cross-examined co-defendant Lanier. Regarding Lisa Lotz and Brad Weaver, the State argues that the Petitioner has failed to explain how co-counsel was deficient.  In any event, the State argues that co-counsel adequately impeached Lotz.  Acknowledging that co-counsel may not have cross-examined Weaver about the Petitioner not being involved in any of the victim's informant matters, the State argues this was of no consequence because "there was never a suggestion [at trial] that [the Petitioner] killed [the victim] because [the victim] had ratted on any of [the Petitioner's] illegal activities."  Finally, the State responds, other than the Petitioner's own statements, the Petitioner failed to establish by clear and convincing evidence that Tabitha Roulette Jones could not have seen co-defendant Holmes from her bed.

We conclude the Petitioner is not entitled to relief.  Regarding witnesses Brad Weaver, Tina Stephens, George Dyer, and Agent Maureen Bottrell, there was no proof as to co-counsel's alleged deficient performance put forth at the post-conviction hearing.  The Petitioner suggests co-counsel was ineffective by failing to engage in *any* cross-examination of these witness.  However, a well-seasoned trial counsel recognizes when a witness has not dealt their case any blows, which relieves the need for cross-examination. We suspect, based on these witnesses' testimony at trial, that to be the case here.  Tina Stephens testified at trial, in relevant part, that on the day of the offense, at approximately 7:30 p.m., she was traveling down the gravel road when she saw lights at the cemetery and

a white truck exiting the cemetery as she passed by. She did not see who was inside the truck. David G. Jenkins, 2017 WL 1425610, at *8. Investigator Brad Weaver testified at trial that during the months prior to the victim's death, the victim provided him with information related to theft and drug cases that he was investigating. Investigator Weaver was unable to "make any cases" using the information that the victim provided after the victim's death. Investigator George Dyer testified at trial that the victim was a confidential informant for him from the fall of 2012 until December 2012 or early 2013. As a result of the information that the victim provided, Investigator Dyer prosecuted crimes involving guns, theft, methamphetamine manufacturing, and marijuana cultivation. The victim was compensated for his assistance. Investigator Dyer said he stopped using the victim as a confidential informant because the victim became careless about whom he told of his assisting Investigator Dyer and about assisting other officers. Investigator Dyer told the victim that the victim's actions were dangerous and could result in the victim's death. David G. Jenkins, 2017 WL 1425610, at *7. Special Agent Maureen Bottrell testified at trial and at the post-conviction hearing that the soil samples taken from the offense location did not match the Petitioner's boots. None of the witnesses' testimony here connected the Petitioner directly or circumstantially to the victim's death. To the extent the Petitioner claims that co-counsel should have revealed through these witnesses that the co-defendants had a stronger motive than the Petitioner to kill the victim, the record shows that trial counsel demonstrated this throughout the trial by distinguishing the Petitioner's affiliation with the Aryan Brotherhood and the co-defendant's affiliation with the Aryan Nation, the organization who ordered the victim to be killed.

Regarding the cross-examination of co-defendant Cory Lanier, the Petitioner argues that trial counsel did not have unidentified "Jencks" material and did not have a transcript of co-defendant Lanier's second statement until the day of trial, which was not enough time to utilize the statement or effectively impeach co-defendant Lanier. However, lead counsel testified at the post-conviction hearing that they were suspicious that a second statement of co-defendant Lanier existed and that they received it "two to three" days prior to trial. Lead counsel also stated that they were prepared for co-defendant Lanier's testimony and that, had impeachment from the second recorded statement been necessary, they would have done so.

Lisa Lotz, who lived in Hobbs, New Mexico, testified at trial, in relevant part, that she met the Petitioner when a friend dropped her off at the Petitioner's home in New Mexico. She said that the Petitioner told her that he had murdered a man and that he was "America's most wanted." The Petitioner told Lotz that when he returned to prison, he would have the name of the man who he killed tattooed on his body with the names of seven other people that were already tattooed on his body. Lotz said she saw the Petitioner's tattoos of the other names and that they were "in like a code type deal." David G. Jenkins, 2017 WL 1425610, at *11-12. The Petitioner argues that co-counsel was

- 16 -

deficient because he "never asked [Lotz] to point specifically to the tattoo she was referring to when she claimed she had seen a "scoreboard" tattoo, allegedly depicting the number of homicides committed by the Petitioner. However, as acknowledged by the Petitioner, lead counsel testified at the post-conviction hearing that he would not have shown them to Lotz, even if given the opportunity, because there was "[t]oo much risk she would have pointed directly to it and it would have backfired." This is sound trial strategy, and the Petitioner is not entitled to relief.

Tabitha Roulette Jones testified at trial to overhearing the conversation between her late boyfriend, Christopher "Shorty" Bryant, and co-defendant Dalton, who bragged about the co-defendants beating of the victim and the Petitioner killing the victim with a ball-pein hammer. The Petitioner argues that co-counsel "could not keep up with [Jones's] testimony" and that it was impossible for Jones to have overheard the conversation because she was not in the cornfield at the time of the offense. Other than the Petitioner's argument and statements to the contrary, there was no evidence offered at the post-conviction hearing disputing Jones's testimony. Moreover, lead counsel testified that their strategy was to show that it was co-defendant Holmes, and not the Petitioner, who was present during this discussion, and that co-defendant Holmes had blood on his sleeves and shirt. Accordingly, the Petitioner has failed to establish deficient performance.

The Petitioner also weaves into this section of his brief the failure of co-counsel to admit into evidence certain text messages between his co-defendants, which he argues show they had "greater culpability" in the offense. Although the text messages were admitted at the post-conviction hearing, lead counsel was not questioned regarding why he chose not to admit them during trial. We fail to see, and the Petitioner has not advanced, how the admission of these text messages would have changed the outcome of the trial. The Petitioner failed to establish deficient performance or prejudice, and he is not entitled to relief.

C. The Petitioner argues generally that lead counsel was ineffective in failing to call additional witnesses at trial; specifically, unidentified store clerks who would have testified that he did not come into the store that day; his girlfriend, Heather Albright, who would have testified that the Petitioner did not come to her house on the night of the offense; and the parents of his girlfriend, who would have testified that they did not see the Petitioner enter their home on the night of the offense and that they have dogs who would have alerted them to his presence. The Petitioner additionally argues that co-counsel should have called "Dr. Mark Wert" and "Investigator Candice M. Sexton," whom he claims would have established the time of the victim's death as between "11:45 p.m. through 4:35 a.m. on 3/24/2013[.]" The Petitioner insists this information would have excluded the Petitioner from being involved in the offense because he was "home, texting his girlfriend at the time." He further argues that Investigator Sexton would have testified

that "the victim was killed somewhere else and dropped off." The State argues, and we agree, that the Petitioner is not entitled to relief on this issue because he did not present any of the above witnesses at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

D. The Petitioner next argues that co-counsel was ineffective in failing to adequately investigate his case. He claims co-counsel failed to retrieve the video footage from the store that the Petitioner and his co-defendants allegedly went to after the victim was killed on the night of the offense, failed to retrieve the Petitioner's employment records, and failed to obtain a complete set of the Petitioner's cell phone records. He argues generally that the "physical evidence should have been challenged more vigorously, specifically the autopsy of the deceased and the Petitioner's phone records." As we understand his argument, the Petitioner claims that co-counsel was ineffective in failing to provide the State with a complete copy of his cell phone records. According to the Petitioner, the State was able to "cherry pick" which records their cell phone expert relied upon in testifying that (1) the Petitioner's phone was likely turned off; (2) the Petitioner's location was unknown; and (3) no phone activity was apparent from the records he was given.

The State maintains that this issue should be waived based on the Petitioner's failure to cite to the record or any legal authority in support of this issue. The State further insists that the Petitioner is not entitled to relief because "counsel cannot be faulted for failing to find the security footage that would have shown [the Petitioner] in a store after the murder because there is still no proof that such video footage actually exists." Moreover, the Petitioner did not present any proof at the post-conviction hearing that the video ever existed or where it could have been found. The State additionally points out that lead counsel testified at the post-conviction hearing that he "laboriously" reviewed the Petitioner's cell phone records and hired an expert with personal funds to review the records. Finally, the State submits that lead counsel investigated the Petitioner's employment records in New Mexico. In the State's view, this does not make the jury instruction on flight improper as suggested by the Petitioner.

At the post-conviction hearing, lead counsel testified that he had indeed obtained the Petitioner's employment records from New Mexico. However, we fail to see, and the Petitioner has not advanced how the admission of this evidence would have impacted his trial. ADA Blount and lead counsel also testified that there had been information in their investigation that led them to believe the Petitioner and his co-defendants went to another store after the victim was killed. ADA Blount testified that there was conflicting information as to which store and that they were unable to obtain any video footage

confirming their information. Lead counsel said he was unaware of any store video footage after the killing and would have investigated it had it existed. The Petitioner did not put forth any evidence of a video. Regarding the Petitioner's cell phone records, the Petitioner presented evidence at the hearing from his first attorney, who had a Cellbrite extraction report of the Petitioner's cell phone. For reasons not borne out at the hearing, lead counsel did not receive the same Cellbrite extraction report. Lead counsel testified that he laboriously reviewed the Petitioner's cell phone records and was unable to find text messages or proof of activity during the relevant time frame. Special Agent Frizzell reviewed the Cellbrite extraction report and confirmed that it did, in fact, contain text messages; however, there was no text message activity during the relevant time frame when the victim was killed. Accordingly, the Petitioner has failed to establish deficient performance or prejudice as to this issue. He is not entitled to relief.

E. The Petitioner argues that trial counsel were deficient in failing to obtain an expert witness to testify as to the precise time of the victim's death, the location of the offense, and the "identities of the unknown DNA contributors." The State argues that this issue is waived because the Petitioner has failed to cite to the record or to any legal authority in support of his claims. See T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Moreover, the State argues this issue was not included in the Petitioner's original or amended petition for post-conviction relief. The State correctly observes that this issue was not included in the original or amended petition for post-conviction relief and is therefore waived. Holland v. State, 610 S.W.3d 450, 458 (Tenn. 2020). Moreover, contrary to the Petitioner's claim, Dr. Zimmerman testified that determining the time of death was not a precise science and that there were difficulties in determining the exact time of the victim's death. The Petitioner did not provide any proof regarding the "identities of the unknown DNA contributors" at the hearing. The Petitioner has failed to establish deficient performance or prejudice.

F. The Petitioner argues that trial counsel was deficient in failing to file timely motions and failing to require the State to prosecute the Petitioner under "one theory." The Petitioner claims trial counsel should have "filed a bill of particulars to ensure that the State chose whether to prosecute [the Petitioner] for first-degree murder or first-degree felony murder." The State notes, and we agree, that the Petitioner has failed to cite to the record or to any legal authority in support of his claims, and they are waived. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Waiver notwithstanding, there is nothing improper with prosecuting the Petitioner for both premeditated first degree murder and felony murder. State v. Addison, 973 S.W.2d 260, 265-67 (Tenn. Crim. App. 1997).

G. The Petitioner argues that trial counsel was deficient in "responding to testimony regarding Mr. Bryan's death and in failing to object to Ms. Jones's supposed knowledge of Ar[y]an Nation and Ar[y]an Brotherhood." The Petitioner argues that trial counsel

should have objected to the testimony solicited by the State from Jones that Bryan's death was due to his cooperation with the police. The Petitioner also argues that trial counsel should have objected to Jones's testimony concerning the difference between the Nation and the Brotherhood based on hearsay. In response, the State argues waiver for failure to cite to the trial record or legal authority. In any event, the State contends the testimony of Jones was "unexpected" and that the "prosecutor moved on without any further reference to []Jones's claim." The State points out that trial counsel chose to revisit the issue on cross-examination to "pin any blame for [the victim's] death on the Aryan Nation, as opposed to the Aryan Brotherhood that [the Petitioner] belonged to." The State insists that such conduct by trial counsel was not constitutionally deficient as none of the testimony at the post-conviction hearing established that Jones's testimony was wrong.

At the post-conviction hearing, lead counsel and co-counsel for the prosecution testified regarding the context of Jones's testimony. Lead counsel explained that co-counsel expected Jones to say that Bryant was not a witness at trial because he had passed away. Instead, Jones said that Bryant had been killed because of his cooperation with authorities. Co-prosecutrix testified that she did not know prior to or after Jones's testimony the circumstances of Bryant's death. The Petitioner exhibited the medical reports from Bryant's death, which showed that Bryant had died of a "suspected overdose." Based on this evidence, the Petitioner argues that lead counsel was deficient in not objecting to Jones's testimony. We are unable to conclude that there was any prejudice stemming from the admission of this testimony. As an initial matter, there was no proof put forth at the post-conviction hearing that defense trial counsel were aware of the circumstances of Bryant's death. Moreover, Jones's testimony was unsolicited by the prosecution, non-responsive, and isolated. It did not implicate the Petitioner in Bryant's death or suggest that the Petitioner was involved. Finally, as noted by the State, even though the Petitioner exhibited Bryant's medical records to the hearing, the Petitioner failed to establish that Jones's testimony was untrue. Regarding lead counsel's failure to object to Jones's testimony about the difference between the Aryan Nation and the Aryan Brotherhood, multiple witnesses, including Jones, testified throughout the trial concerning their first-hand knowledge of the Aryan Nation and the Aryan Brotherhood. Moreover, because the Petitioner has failed to cite to the record or provide legal authority in support of this claim, it is waived. Accordingly, the Petitioner is not entitled to relief.

H. The Petitioner next claims that trial counsel was deficient because he failed to object based on Crawford v. Washington, 541 U.S. 36 (2004) or Bruton v. United States, 391 U.S. 123 (1968), regarding an out of court statement made by co-defendant Todd Dalton, implicating the Petitioner. As we understand this claim, the Petitioner argues that trial counsel was deficient in failing to object to the testimony of Tabatha Roulette Jones regarding the conversation she overheard between Christopher "Shorty" Bryant and Todd Dalton, discussing the murder of the victim. In response, the State initially argues waiver

because the Petitioner failed to include this issue in his original or amended petition for post-conviction relief. Waiver notwithstanding, the State contends the Petitioner misapprehends the law as there was no Bruton violation for trial counsel to object to in this case because the Petitioner was not tried jointly with co-defendant Dalton. The State further contends that there was no violation of the confrontation clause under Crawford because "[co-defendant] Dalton's statements to his friends, overheard by [Jones], were not 'testimonial[.]'" Upon our review, the State correctly observes that the Petitioner has waived any Bruton claim for failure to include it in his original or amended petition for post-conviction relief.

To the extent that the Petitioner has raised a deficiency claim based on trial counsel's failure to lodge an objection based on Crawford, the Petitioner is not entitled to relief. On direct appeal, the Petitioner argued that the trial court erred in admitting Jones's testimony regarding statements that she overheard co-defendant Dalton make to Christopher "Shorty" Bryant about the details of the victim's death. Instead of a confrontation clause challenge under Crawford, the Petitioner maintained that co-defendant Dalton's statements were inadmissible hearsay and that the trial court erred in finding that co-defendant Dalton's statements qualified as statements against interest pursuant to Tennessee Rule of Evidence 804(b)(3). David G. Jenkins, 2017 WL 1425610, at *21. In denying relief, this court noted that co-defendant Dalton had asserted his Fifth Amendment privilege against self-incrimination and was therefore unavailable. We also rejected the Petitioner's argument that statements to a fellow member of the Aryan Nation with no expectation that Jones would overhear the conversation and with no "perception that his statements [would] expose him to criminal liability" was unreliable or contrary to Rule 804(b)(3). Id. at *22.

The threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial. State v. Dotson, 450 S.W.3d 1, 63 (Tenn. 2014) (citing State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008)). We conclude that Jones's in court testimony concerning what she overheard co-defendant Dalton say about the victim's death was non-testimonial hearsay, which does not run afoul of Crawford. Accordingly, the Petitioner is not entitled to relief.

I. The Petitioner argues that trial counsel was deficient in failing to "convince the trial court to admit the statements of [co-defendant] Dalton regarding his rule that no one be allowed in his shop while he was gone." The Petitioner explains that admission of [codefendant] Dalton's policy would have countered the State's theory that the Petitioner's involvement in the offense was a premeditated act. The Petitioner also challenges here, without argument, whether trial counsel was ineffective in failing to assert at trial, in his motion for new trial, or on appeal that the conviction was based solely on the uncorroborated testimony of an accomplice. The record shows that the Petitioner failed to

put forth any evidence other than argument in support of this issue. Accordingly, he is not entitled to relief.

J. The Petitioner contends that trial counsel was deficient in failing to object based on Rule 404(b) of the Tennessee Rules of Evidence. The Petitioner argues generally that certain bad acts were improperly admitted during his trial including (1) his membership in and characterization of the Aryan Nation; (2) the Petitioner's commission of seven other murders; (3) that the Petitioner committed cannibalism and murder in New Jersey; (4) that the Petitioner was on drugs; and (5) that the Petitioner was responsible, in part, for the murder of Christopher "Shorty" Bryan. The State responds, and we agree, that this issue is waived based on the failure to raise it on direct appeal, the failure to present proof of this issue at the post-conviction hearing, and the failure to support this issue with citation to the record or legal authority. The Petitioner is not entitled to relief.

K. The Petitioner next contends that the State violated <u>Massiah v. United States</u>, 377 U.S. 201 (1964), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). <u>Massiah</u> is the seminal federal case on the circumstances under which post-indictment statements made by an accused to an undercover government agent will be deemed an infringement of the accused's Sixth Amendment right to counsel. <u>State v. Willis</u>, 496 S.W.3d 653, 703 (Tenn. 2016). The primary concern of the <u>Massiah</u> line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. <u>Id.</u> at 705. A defendant does not make out a <u>Massiah</u> violation simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. <u>Id.</u> <u>Giglio</u> requires the State to disclose promises made to witnesses that they would not be prosecuted in exchange for their cooperation with the government. 405 U.S. 154. The non-disclosure of such promises equates to a violation of due process. <u>Id.</u>

The Petitioner argues the State violated <u>Massiah</u> and <u>Giglio</u> with the testimony of Josh Russell. The Petitioner claims that Russell was "moved into his cell for the specific purpose of seeking information . . . to use against [the Petitioner], and the State failed to disclose to the defense the existence of an agreement with Mr. Russell." At trial, Russell testified that while incarcerated with the Petitioner, the Petitioner told him details about the murder. <u>David G. Jenkins</u>, 2017 WL 1425610, at *12-13. Russell also testified that he was incarcerated for a pending charge of sale and delivery of a Schedule IV drug. He stated that he did not have a firm agreement with the State on the resolution of his charges in exchange for his testimony at trial. While he did not receive any promises from the State in exchange for his testimony, his sentencing hearing on his charge was postponed until after he testified at the Petitioner's trial. Russell was originally charged with selling drugs in a school zone, but that charge was dismissed. He previously had been charged with

escape after missing a head count at a halfway house. He had three prior convictions for drug trafficking in Kentucky. 2017 WL 1425610, at *13. To the extent that there was any proof offered at the post-conviction hearing in support of this issue, it was consistent with the testimony at trial. Accordingly, the Petitioner has failed to establish a violation of Massiah or Giglio, and he is not entitled to relief.

L. The Petitioner claims he is entitled to post-conviction relief based on trial counsel's failure to object to various grounds of prosecutorial misconduct including the failure to disclose the second statement by co-defendant Lanier, the failure to disclose the nature of the State's agreement with Josh Russell, the failure to disclose that Lisa Lotz was "a professional informant," and that the failure to disclose that Tabitha Roulette Jones was "mentally ill" based on her alleged disability status. The Petitioner also generally argues that the State "disregard[ed] due process" and "suborn[ed] perjury." In support of this issue, the Petitioner points to certain testimony as evidence of the State's suborning of perjury including Jones's testimony concerning the circumstances of Bryant's death, George Dyer's testimony that he had no opportunity to test the Petitioner's clothing, and Russell's testimony that he did not have a deal with the State. The Petitioner insists that his conviction was based on evidence known to be false by the State. He also argues the State engaged in improper opening statement when co-counsel stated, "You will hear from Coty Holmes and Corey Lanier. They've also been charged for their involvement in the death of Corey Mathews. They worked a deal with the State for their truthful testimony." The Petitioner further contends that the State improperly vouched for the credibility of codefendants Holmes and Lanier in closing by stating that "they gave their truthful statements that implicated themselves."

The State argues that this issue is waived because the Petitioner does not specifically identify the supposedly objectionable testimony or argument, nor does he cite to any portion of the record where this occurred. In any event, the State contends, and we agree, that the Petitioner is not entitled to relief. As previously discussed above, lead counsel received the second statement of co-defendant Lanier and was able to utilize it at trial. Lotz also testified at trial that she received a reward of $200 from law enforcement in Hobbs and $2,500 from the TBI as a result of the Petitioner's arrest. She was unaware that there was a reward for information leading to the Petitioner's arrest prior to reaching out to law enforcement. Other than the Petitioner's statements and argument, there was no evidence at the post-conviction hearing concerning Lisa Lotz or Jones as to this issue. We additionally conclude, based on our prior discussion above, that the State did not suborn perjury in this case. Finally, we have reviewed the opening and closing statements of the prosecutors in this case and conclude that the Petitioner has failed to establish prosecutorial misconduct. He is not entitled to relief as to the issue.

**CONCLUSION**

- 23 -

Because the Petitioner has failed to establish deficient performance or prejudice to his case based on the ineffective assistance of trial counsel, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE